UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
————————————————————————x

ROSEMARIE BERNADEL,


                Plaintiff,

            v.

COMMISSIONER OF SOCIAL SECURITY,

                Defendant.

————————————————————————x

**MEMORANDUM & ORDER**
14 CV 5170 (PKC)

PAMELA K. CHEN, United States District Judge:

       Plaintiff Rosemarie Bernadel ("Bernadel" or "Plaintiff") commenced this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of Defendant Commissioner of Social Security (the "Commissioner") denying Bernadel her claim for disability insurance benefits. (Dkt. 1.) The Commissioner moves for judgment on the pleadings, affirming her decision, and Bernadel cross-moves for judgment on the pleadings, reversing the Commissioner's decision and remanding for a new hearing and decision. (Dkts. 15, 16.) For the reasons set forth below, the Court GRANTS Bernadel's cross-motion, and DENIES the Commissioner's motion.

## *BACKGROUND*

       Bernadel, who was unrepresented in the agency proceedings, protectively filed an application for disability insurance benefits on April 20, 2011, alleging disability since she stopped working on January 25, 2008 because of back and leg pain when sitting for extended periods, severe abdominal discomfort with back pain, multiple abdominal surgeries (including a

2003 surgery for small bowel obstruction[1]), abdominal adhesions and hernia, diverticulitis[2], and digestive problems. (Tr. 90, 152, 156.)[3] Bernadel also claimed a disability based on a right ovary removal in 1980, an ovarian cyst, a myomectomy[4] in 2001, and a left breast carcinoma and lumpectomy[5] in 2001. (Tr. 156.) The application was denied on July 29, 2011. (Tr. 36, 43−46.)

Bernadel appealed the denial, adding that since May 2011 her blood pressure had increased significantly. She also stated that she suffered from anxiety, depression, and insomnia, and that her anxiety made her digestive problems worse. (Tr. 135.)

Bernadel requested a hearing (Tr. 47), which was held on November 6, 2012, before Administrative Law Judge ("ALJ") Margaret Donaghy. (Tr. 19−34.) ALJ Donaghy considered the case *de novo*, and on December 21, 2012, found that Bernadel was not disabled. (Tr. 8−15.) The decision of the ALJ became the final decision of the Commissioner when the Appeals Council denied Bernadel's request for review on July 14, 2014. (Tr. 1−3.) This action followed.

---

[1] Bowel obstruction describes a blockage that keeps food from passing through the small intestine, which may be caused by post-surgical abdomen adhesions, diverticulitis, hernias, or tumors. *See* Mayo Clinic, *Intestinal obstruction*, http://www.mayoclinic.org/diseases-conditions /intestinal-obstruction/basics/definition/con-20027567 (last visited Sept. 29, 2015).

[2] Diverticulitis is characterized by inflammation or infection in small pouches that bulge outward through the colon or large intestine. *See* Medline Plus, *Diverticulosis and Diverticulitis*, https://www.nlm.nih.gov/medlineplus/diverticulosisanddiverticulitis.html (last visited on Sept. 29, 2015). A chronic condition, it causes gastrointestinal problems and is aggravated by tension. *See Mitchell v. New York City Transit Auth.*, 856 F. Supp. 2d 478, 480 (E.D.N.Y. 2012).

[3] "Tr." refers to pages of the administrative transcript. (Dkt. 8.)

[4] A myomectomy is a surgical procedure to remove uterine fibroids — also called leiomyomas. These are common noncancerous growths that appear in the uterus but may cause symptoms that interfere with activities. *See* Mayo Clinic, *Myomectomy*, http://www.mayoclinic.org/tests-procedures/myomectomy/basics/definition/PRC-20012919?p=1 (last visited Sept. 29, 2015).

[5] A lumpectomy is surgery to remove a tumor in a breast and a small amount of normal tissue around it, usually performed to treat breast cancer. *See* Medline Plus, *Mastectomy*, https://www.nlm.nih.gov/medlineplus/mastectomy.html (last visited Sept. 29, 2015).

## I.    <u>Testimonial and Vocational Evidence</u>

Born in 1954, Bernadel was 53 years old at the time of her alleged disability onset and 58 years old on the date of the ALJ's decision. (*See* Tr. 90.) She reported that she had finished four or more years of college. (Tr. 26, 157.) She worked as a social insurance specialist for the Social Security Administration ("SSA") from June 1994 until January 2008, when she stopped because her impairments made it difficult for her to sit down for the long hours required by her work, and she was not permitted to work part-time. (Tr. 75−78, 156−57, 164−65.)

Bernadel completed a function report on June 20, 2011. (Tr. 140, 150.) She reported that she lived in an apartment with her adult daughter, prepared food daily, performed light cleaning once or twice a week, and shopped for food twice a week. (Tr. 140−41, 143−44, 150.) Her daughter helped with the laundry, "heavy chores," and shopping. (Tr. 143, 150.) Bernadel had one friend whom she saw once a week. (Tr. 145, 150.)

Bernadel further indicated that she suffered from insomnia, nightmares, and pains and cramping in her abdomen and back. (Tr. 141, 150.) She had "severe food allergies" and gluten intolerance, as well as bowel obstruction. (Tr. 142−43.) She also reported that sudden stress caused her to experience stomach pain and diarrhea, and stated that her abdominal muscles were weakened by due to multiple surgeries. (Tr. 146, 148.) Bernadel claimed that she could not sit for more than 15−20 minutes or stand for more than a half-hour without experiencing pain in her abdomen and back, as well as leg cramping and shaking when she sits. (Tr. 145−46, 149.)

In a pain questionnaire also completed on June 20, 2011, Bernadel reported that her abdominal pain and cramps, and general discomfort began in 1999 when she had fibroid surgery, and worsened after she had a bowel obstruction. (Tr. 148.) The pain in her lower back and abdomen, thighs, and legs prevented her from sitting for long periods. (Tr. 148−50.) The pain

made eating uncomfortable, "sometimes impossible," and at times resulted in sudden diarrhea. (Tr. 150.) She underwent a magnetic resonance imaging ("MRI") for her back, but did not visit her regular doctors for the pain "due to [a] lack of health insurance." (Tr. 148.) She tried pain medication, but stopped because the medicine worsened her digestive problems; instead, Bernadel took "herbal medicine" in tea form. (Tr. 149−50.)

At the November 6, 2012 administrative hearing, Bernadel appeared without a representative. (Tr. 21.) The ALJ explained Bernadel's right to be represented, and offered postponement so that Bernadel could obtain counsel, which Bernadel decline. (Tr. 21−22.) At the hearing, Bernadel submitted a report from 2007 describing her health problems. (Tr. 22−23.)

Bernadel testified that she could not work because of depression, anxiety, insomnia, nightmares, and trauma from past domestic violence. (Tr. 27.) Bernadel stated that she had a "feeling of helplessness and hopelessness" and that she "[did not] want to live no more." (Tr. 30.) Bernadel also reported high blood pressure, frequent headaches, digestive problems and dietary restrictions, abdominal pain caused by scars from several past surgeries, and occasional back pain. (Tr. 27−28.)

She had to be very careful with what she ate because she had many allergies and her digestive system would become "clogged up for days" if she were careless. (Tr. 28.) She had headaches, which she thought might be associated with high blood pressure. She also had weak abdominal muscles, making exercise difficult. (*Id.*) Bernadel testified she lived in her adult daughter's apartment in Brooklyn. (Tr. 26.) She was able to prepare meals and wash dishes for herself and her daughter, but her daughter did the laundry because she could not push the laundry cart herself. (Tr. 29.) She could also go to the grocery store for small things. (*Id.*) She took public transportation and did not have any problems using it. (Tr. 30.) On a usual day, she

would read, make food, go outside, and try to walk around. She had more recently been taking master's−level courses in school counseling, but had stopped a few semesters earlier because her assignments and deadlines made her "very anxious." (*Id.*)

Bernadel related that she had not seen her doctors for her conditions because her health insurance stopped in June 2007 and her daughter could not afford to pay her medical bills. (Tr. 23, 24.) She stated that she was on a Health Plus plan for a short period, but had been unable to find a doctor who would accept it. (Tr. 24−25.) She stated that the only treatment that she had received since then were mammograms, which her daughter paid for, and OB/GYN examinations from Dr. Michael Brodman, who saw her for free. (Tr. 23.) She had not gone to any clinics or emergency rooms for treatment since her alleged onset date. (Tr. 25, 28.) She was not taking any prescription medications, but was taking herbal medicines, mostly in the form of teas, as well as an over-the-counter pill for blood pressure. (Tr. 29.) She had not undergone any mental health treatment to address her depression and anxiety, except for in 2007, when a doctor gave her a prescription, which caused her to act strangely. (Tr. 27.) She had not seen this doctor since her insurance stopped. (Tr. 27−28.)

Bernadel asked the ALJ about a letter that she had received asking her to return to the consultative examiner ("CE"). (Tr. 31.) She was originally scheduled to re−visit the CE on October 30, but that appointment had been rescheduled for November 14, a week after the administrative hearing. Bernadel asked if it was necessary for her to go to this appointment after the hearing. The ALJ responded that it would not be necessary and that the appointment would be cancelled. (*Id.*)

In addition, Bernadel's daughter, Elizabeth Sergile, also testified at the administrative hearing. (Tr. 32−33.) Ms. Sergile stated that she was 34 years old, and that her mother had lived

with her for the past 12 years. (Tr. 32.) She reported that her mother had many digestive problems, which sometimes led to needing to use the bathroom urgently or becoming bloated. (Tr. 33.) She also reported that Bernadel experienced variations in her blood pressure, and had a lot of anxiety and depression, sometimes making her difficult to be around. She had tried to help her mother obtain health insurance, but found it difficult because doctors did not accept the insurance. (*Id.*)

## II.     Medical Evidence Prior to January 25, 2008 (Alleged Onset Date)

On April 10, 2001, Dr. William Simpson performed a pelvic ultrasound of Bernadel, which showed a leiomyomatous uterus, enlarged right ovary containing a simple cyst, and status post left oophorectomy.[6] (Tr. 222−23.) On June 7, 2001, Dr. Brodman, a surgeon at Mt. Sinai Medical Center ("Mt. Sinai"), performed an abdominal myomectomy related to Bernadel's diagnosis of fibroid uterus and menometrorrhagia.[7] (Tr. 217−19.)

On August 20, 2001, Dr. Simpson conducted a pelvic ultrasound, and noted that Bernadel had post myomectomy pelvic pain and swelling. (Tr. 221.) The pelvic ultrasound showed an unremarkable right ovary, normal sized uterus, and no discrete fibroid. (*Id.*) Dr. Brodman also ordered a series of x−rays, which were taken on August 20, 2001 by Dr. Eric Wilck. The x-rays revealed a small calcification, but no evidence of bowel obstruction. (Tr. 221−22.)

On November 30, 2001, clinical surgeon and breast cancer specialist Dr. Alexander Swistel performed a biopsy of both breasts. (Tr. 229−30.) The surgical pathology report

---

[6] An oophorectomy refers to a surgical procedure to remove one or both ovaries. *See* Mayo Clinic, *Oophorectomy*, http://www.mayoclinic.org/testsprocedures/oophorectomy/basics/definition/prc-20012991 (last visited Sept. 29, 2015).

[7] Menometrorrhagia is defined as excessive and prolonged uterine bleeding occurring at irregular and/or frequent intervals. *See* PubMed, *Menometrorrhagia during premenopause*, http://www.ncbi.nlm.nih.gov/pubmed/22182054 (last visited Sept. 29, 2015).

diagnosed a mass on the right breast and carcinoma on the left breast. (Tr. 207−08.) On December 21, 2001, a follow−up biopsy following a lumpectomy, did not identify any residual malignancy. (Tr. 209−10.)

On March 10, 2002, Bernadel was vomiting, and x−rays showed a bowel obstruction. (Tr. 220.) A CT scan of Bernadel's abdomen showed a small bowel obstruction which was "highly suggestive of matted or twisted loops of bowel", and a nodular opacity in the inferior aspect of the left breast. (*Id.*) On March 11, 2002, Dr. Moises M. Tenembaum, MD, a surgeon at Mt. Sinai, performed an exploratory laparotomy, lysis of adhesions, and repair of internal hernia. (Tr. 214−17.) Dr. Tenembaum's postoperative diagnosis was small bowel obstruction secondary to internal hernia. (Tr. 214.)

On July 7, 2003, Dr. Swistel performed a biopsy of a nodule found on the left breast. The pathology report found the biopsy was consistent with fibrocystic change. (Tr. 212.) On October 28, 2004, a biopsy of a new calcification on the left breast showed benign breast tissue. (Tr. 211.)

On February 15, 2006, Bernadel saw Dr. Swistel, complaining of pain and nodularity in her left breast. (Tr. 206.) Examination showed no evidence of disease, but nodularity in the upper half of the left breast. Dr. Swistel diagnosed malignant neoplasm of the upper−outer quadrant of her breast. He recommended that Bernadel get a follow−up ultrasound in six months and return for a routine annual examination in one year. (*Id.*)

On June 27, 2006, Bernadel underwent a baseline bone density study at Lenox Hill Radiology on a referral from Dr. Edward C. Yang, an orthopedist. (Tr. 171−75.) The study

demonstrated normal bone density in her lumbar spine, and moderate osteopenia[8] in the proximal left femoral neck region. (Tr. 171.) Bernadel was recommended to continue follow−up and to repeat the study after an interval. (Tr. 171−72.)

On February 12, 2007, Bernadel saw Dr. Swistel for a routine follow-up examination. (Tr. 205.) That examination showed no evidence of disease in the left breast, and slight nodularity in the upper outer quadrant of her right breast. Dr. Swistel diagnosed diffuse cystic mastopathy, fibroadenosis of the breast, and malignant neoplasm of the upper−outer quadrant of her breast. Dr. Swistel reassured Bernadel about her health status, discussed self-examination techniques, and recommended that she return in one year and continue annual mammograms. (*Id.*)

On April 11, 2007, Bernadel saw Dr. Robert Aiken for a neurological consultation. (Tr. 271−72.) Bernadel had been referred by her orthopedist Dr. Yang because of a history of intermittent low back pain since 1999, with increasing low back and right leg pain of two−to−three weeks' duration. (Tr. 271.) In addition to the small bowel obstruction due to hernia in 2002 and myomectomy in 2001, Dr. Aiken noted that Bernadel had an abdominoplasty in 1999. Dr. Aiken also reported that Bernadel was "due to begin taking Lexapro 10 mg q.d for depression." (*Id.*)[9]

Bernadel reported to Dr. Aiken that she was struck by a motor vehicle in 1999 and thrown to the curb, causing a strained or nondisplaced fracture of her forearm and lower back pain. (*Id.*) Her low back pain lasted three or four months, and resolved with physical therapy.

---

[8] Osteopenia is a term to define bone density that is not normal, but also not as low as osteoporosis. *See* PubMed, *Diagnosis and treatment of osteopenia*, http://www.ncbi.nlm.nih.gov/pubmed/21234807 (last visited Sept. 29, 2015).

[9] The report does not indicate the identity of the physician who prescribed this medication, nor is the prescribing physician identified elsewhere in the record.

Dr. Aiken noted that in January and February 2006, she developed intermittent low back pain, associated with radiation down her right leg to her heel. This pain fluctuated and was aggravated when sitting. (Tr. 271−72.) The pain had significantly worsened in the two or three weeks prior to the exam, both across her lower back and down her right leg. (Tr. 271.) Bernadel did not take any analgesics because of her history of gastritis. (Tr. 272.)

Upon examination, Dr. Aiken observed that Bernadel appeared uncomfortable. (*Id.*) She exhibited a full range of motion in the cervical spine, lumbar spine, and extremities. Dr. Aiken further found no spinal or paravertebral muscle spasm; no sciatic notch tenderness; normal higher cortical function; normal muscle tone throughout; normal motor power in the upper and lower extremities. Finally, he observed dullness to pinprick along the right L5 dermatome; symmetric active reflexes; normal coordination; and normal heel, toe, casual, and tandem gait. (*Id.*)

Based on his examination, Dr. Aiken suspected a symptomatic herniated lumbar disc. (*Id.*) He recommended a lumbar spine MRI, physical therapy, steroid therapy, and Tylenol with codeine as needed. Bernadel began a steroid taper beginning at 60 mg q.d. and tapering to none over one week. Dr. Aiken indicated that he would like Bernadel to visit him again in four to six weeks, or sooner if problems developed. (*Id.*)

On April 21, 2007, on a referral from Dr. Aiken, Bernadel underwent a lumbar spine MRI. (Tr. 176−80.) Although Bernadel presented with pain, the MRI study showed no evidence of metastatic disease and no significant disc bulge or herniation. (Tr. 176.)

On September 19, 2007, Bernadel saw Dr. Swistel for a routine follow-up examination. (Tr. 204.) That examination showed no palpable masses in her breasts. Dr. Swistel diagnosed diffuse cystic mastopathy, fibroadenosis of the breast, and carcinoma of the breast. Dr. Swistel

recommended that Bernadel return in one year, and sooner if any change was detected upon self-examination.  (*Id.*)

### III.  <u>Medical Evidence After January 25, 2008 (Alleged Onset Date)</u>

On October 20, 2008, Bernadel saw Dr. Swistel for a routine follow-up examination.  (Tr. 203.)  Examination of the breasts showed no evidence of disease and no dominant masses palpable.  Dr. Swistel diagnosed diffuse cystic mastopathy, and fibroadenosis of the breast.  Dr. Swistel recommended that Bernadel return in one year, or sooner if any change was detected upon self-examination, and that she continue annual mammograms.  (*Id.*)

On February 28, 2009, on referral from Dr. Brodman, Bernadel underwent a transvaginal pelvic ultrasound at Lenox Hill radiology.  (Tr. 181−84.)  The ultrasound showed a small simple right ovarian cyst or follicle, and the radiologist recommended a follow−up ultrasound in six months. (Tr. 181.)

On November 2, 2009, Bernadel saw Dr. Swistel for a routine follow-up examination. (Tr. 202.)  Bernadel complained of slight pain in the upper outer quadrant of the right breast. Examination showed nodularity in the right breast, but no dominant masses palpable bilaterally. Dr. Swistel diagnosed diffuse cystic mastopathy, fibroadenosis of the breast, and malignant neoplasm of the upper–outer quadrant of her breast.  Dr. Swistel reassured Bernadel, discussed self−examination techniques, and recommended that she return in one year and continue annual mammograms.  (*Id.*)  Bernadel again visited Dr. Swistel on November 8, 2010 for a routine follow-up examination.  (Tr. 201.)  The breast examination showed nodularity, but no dominant masses palpable bilaterally.  Dr. Swistel's diagnosis and recommendations were consistent with the 2009 visit.  (*Id.*)

On July 8, 2011, Dr. Vinod Thukral performed a consultative internal medicine examination. (Tr. 190−96.) Bernadel related that she had had an ovarian cyst surgery in 1980, an incisional hernia repair surgery in 1999, and a myomectomy in 2001. (Tr. 190−91.) She also reported that after her intestinal obstruction surgery in 2002, she had experienced intermittent diarrhea and gastritis. (Tr. 190.) Bernadel stated that she had seen her primary care doctor three or four years prior to the date of the exam by Dr. Thukral, who advised conservative treatment.[10] In addition, Bernadel reported that after the 2002 surgery, she began having lower back pain at a level of 7 out of 10 that was dull and intermittent and occurred when sitting for a long period or sometimes while walking. (Id.) Bernadel also related her history of breast cancer, which included a lumpectomy and excisions of calcification in each breast. (Tr. 190−91.) Bernadel reported that she had followed up with her oncologist regularly until November 2010, and that her cancer was in remission. (Tr. 191.) Bernadel additionally reported that she was not on any medication, and that she showered, bathed, and dressed daily, cooked daily, cleaned once or twice a week, and shopped twice a week. She also reported that her daughter did the laundry. Although Bernadel denied any history of high blood pressure or heart disease, upon physical examination, Dr. Thukal found that Bernadel had high blood pressure. (Id.) He referred Bernadel to the emergency room for follow-up with respect to potential hypertension. (Tr. 191, 193, 196.)

Dr. Thukral's examination indicated that Bernadel did not appear to be in acute distress. (Tr. 192.) Her gait and stance were normal, and she walked on her heels and toes without difficulty. She could perform a full squat. She did not require use of an assistive device. She was able to change for the examination, get on and off of the examination table, and rise from a

_____

[10] Dr. Thukral's report does not identify Bernadel's primary care physician.

chair without difficulty. Her bowel sounds were normal. The examination revealed Bernadel's soft and nontender abdomen; two old, healed scars on the anterior abdomen. (*Id.*) She had full ranges of motion in her spine, shoulders, elbows, forearms, wrists, hips, knees, and ankles bilaterally; negative straight-leg-raising; stable and non-tender joints; no muscle atrophy; full 5 out of 5 strength in her upper and lower extremities; no sensory deficits; symmetric deep tendon reflexes; intact hand and finger dexterity; and full 5/5 grip strength. (Tr. 192−93.) Bernadel's lumbosacral spine x−rays were negative. (Tr. 193, 195.)

Dr. Thukral diagnosed lower backache, by history; gastritis (not on any medication), by history; left breast cancer (now in remission), by history; right breast calcification (resolved), by history; incisional hernia (status post repair), by history; and hypertension on examination. (Tr. 193.) Dr. Thukral opined that, on the basis of his examination, Bernadel had no limitations for sitting, standing, pulling, pushing, or any other such related activities. (*Id.*) Because of Bernadel's blood pressure of 180/90, Dr. Thukral advised Bernadel to go to the emergency room for immediate treatment, and to follow up with her primary care physician. (Tr. 191, 193, 196.)

On July 21, 2011, Mr. D. Komoroff, a State agency disability analyst, followed up with Bernadel regarding the treatment she received after being directed to go to the emergency room by Dr. Thukral. (Tr. 151.) Bernadel reported that she did not go to the emergency room, or see any other providers, because it was too expensive. Instead, she went home and tried to rest, and had not seen any treating source since then. (*Id.*)

On July 25, 2011, a State agency medical consultant, Dr. B. Gajwani, an oncologist, reviewed the medical evidence related to Bernadel's history of breast cancer, noting that there was no evidence of recurrence. (Tr. 197−98.) Dr. Gajwani opined that Bernadel's breast cancer did not meet or equal Listing 13.10 or impact Bernadel's functional capacity. (Tr. 197.)

*STANDARD OF REVIEW*

### I.     District Court Review of Administrative Decision

In reviewing a final decision of the Commissioner, the Court's duty is to determine whether it is based upon correct legal standards and principles and whether it is supported by substantial evidence in the record, taken as a whole.  *See Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (the Court "is limited to determining whether the [SSA's] conclusions were supported by substantial evidence in the record and were based on a correct legal standard"). "Substantial evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (alterations and internal quotation marks omitted).  In determining whether the Commissioner's findings were based upon substantial evidence, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn."  *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983).  However, the Court is mindful that "it is up to the agency, and not this court, to weigh the conflicting evidence in the record."  *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998).  Under any circumstances, if there is substantial evidence in the record to support the Commissioner's findings as to any fact, they are conclusive and must be upheld.  42 U.S.C. § 405(g); *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013).

Before determining whether the Commissioner's conclusions are supported by substantial evidence, however, the Court "must first be satisfied that the claimant has had a full hearing under the  . . . regulations and in accordance with the beneficent purposes of the . . . Act." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (quoting *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d

Cir. 1990)) (internal quotation marks omitted). "The Act must be liberally applied, for it is a remedial statute intended to include not exclude." *Cruz*, 912 F.2d at 11.

## II.  Disability Under the Social Security Act

The Act provides that an individual is disabled if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify for benefits, the claimed disability must result "from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 1382c(a)(3)(D); *accord Tejada v. Apfel,* 167 F.3d 770, 773 (2d Cir. 1999). The Act's regulations prescribe a five–step analysis for the Commissioner to follow in determining whether a disability benefit claimant is disabled within the meaning of the Act. *See* 20 C.F.R. § 404.1520(a).

First, the Commissioner determines whether the claimant currently is engaged in "substantial gainful activity." If so, the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(i).

If not, the Commissioner proceeds to the second inquiry, which is whether the claimant suffers from a medical impairment, or combination of impairments, that is "severe," meaning that the impairment "significantly limits [claimant's] physical or mental ability to do basic work activities." If the impairment is not severe, the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(ii), (c).

If the impairment is severe, the Commissioner proceeds to the third inquiry, which is whether the impairment meets or equals one of the impairments listed in Appendix 1 to Subpart P of Part 404 of the Act's regulations. If so, the claimant is presumed disabled and entitled to benefits. 20 C.F.R. § 404.1520(a)(4) (iii).

If not, the Commissioner proceeds to the fourth inquiry, which is whether, despite claimant's severe impairment, he has the "residual functional capacity" ("RFC") to perform past work. 20 C.F.R. § 404.1520(a)(4)(iv). In determining a claimant's RFC, the Commissioner considers all medically determinable impairments, even those that are not "severe." 20 C.F.R. § 404.1545(a). If the claimant's RFC is such that s/he can still perform past work, the claimant is not disabled.

If the claimant cannot perform past work, the Commissioner proceeds to the fifth and final inquiry, which is whether, in light of the claimant's RFC, age, education, and work experience, the claimant has the capacity to perform other substantial gainful work which exists in the national economy. 20 C.F.R. § 404.1520(a)(4)(v). If the claimant has such capacity, the claimant is not disabled. If not, the claimant is disabled and entitled to benefits. *Id.*

The claimant bears the burden of proving her or his case at steps one through four; at step five, the burden shifts to the Commissioner to establish that there is substantial gainful work in the national economy that the claimant could perform. *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004).

## DISCUSSION

### I. The ALJ's Decision

The ALJ issued her decision denying Bernadel benefits on December 21, 2012. (Tr. 15.) The ALJ evaluated Bernadel's claim pursuant to the sequential evaluation process, concluding at step two. (Tr. 13−15). At step one, the ALJ determined that Bernadel had not engaged in substantial gainful activity since her January 25, 2008 alleged disability onset date. (Tr. 13.) Proceeding to step two, the ALJ found that there were no medical signs or laboratory findings to substantiate the existence of a medically determinable "severe" impairment. (Tr. 13−14.) The

ALJ noted that although Bernadel alleged disability due to depression, anxiety, high blood pressure, gastric problems, and back pain, there was no medical evidence of any treatment during the relevant period for these impairments. (Tr. 14.) The ALJ thus relied on the opinion of consultative examiner Dr. Thukral, in which Dr. Thukral found that Bernadel had no functional limitations due to any physical limitations. The ALJ assigned "great weight" to Dr. Thukral's opinion because it was supported by his examination, x-ray findings, and Bernadel's statement regarding her daily activities. (*Id.*)

While the ALJ found the testimony of Bernadel and her daughter to be "somewhat credible", he found Bernadel's explanation about not seeking treatment for her impairments because she did not have health insurance "not entirely plausible", since "[m]any, if not most, of the claimants who appear in Brooklyn have obtained public health insurance that offers them access to at least some care." (*Id.*) Based on the absence of medical evidence and Dr. Thukral's findings, the ALJ found no medically determinable impairments in the record relating to the period after Bernadel stopped work in January 2008, and thus concluded that Bernadel was not disabled. (Tr. 14−15.) Having found that Bernadel was not disabled at step two, the ALJ did not proceed to the rest of the sequential evaluation. (Tr. 15); *see* 20 C.F.R. § 404.1520(a)(4)(ii).

In her January 15, 2013 request for review of the ALJ decision to the Appeals Council, Bernadel contended that the ALJ improperly canceled her second medical appointment, and disregarded Bernadel's claim that her ability to work had been diminished by her surgeries and her advancing age. (Tr. 4, 6.) Bernadel explained that she left her job because she was unable to work part-time, and looked for other part-time work for three years before applying for disability benefits. (Tr. 6.) She also contended that the ALJ incorrectly focused on the absence of medical evidence, given that Bernadel had been unable to seek treatment due to her lack of insurance, and

given that Bernadel had requested an opportunity to submit medical records from a surgeon who had not sent his files for the hearing.  (*Id.*)

## II.     <u>Errors in the ALJ's Decision Warrant Remand of this Action</u>

Based on assessment of the record, the Court concludes that the ALJ's decision suffers from a number of defects that justify a remand for further development of the record and for findings supported by substantial evidence.  While the Court acknowledges that there is limited medical evidence on the record supporting disability in this case, the principal problem with the ALJ's decision is that she failed to fulfill her duty to fully develop the record, especially in light of Bernadel's *pro se* status before the agency, her testimony regarding her indigence and inability to afford medical care, and record evidence suggesting a mental impairment.  As further described below, the ALJ also committed legal error by drawing impermissible negative inferences regarding Bernadel's credibility based on her lack of medical treatment.

### A.   The ALJ Failed to Adequately Develop the Record

Bernadel contends that the ALJ fell short of her obligation to make all reasonable efforts to explore the relevant data and opinion to ensure that her decision was based on a full and fair development of the record.  (Dkt. 15−1 at 9−11.)[11]  The Court agrees.

Since disability-benefits proceedings are non-adversarial in nature, it is well-established the ALJ has an affirmative obligation to develop a complete administrative record.  *See Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 508–09 (2d Cir. 2009); *Butts*, 388 F.3d at 386.  Failure to develop the record may be grounds for remand.  *Rosa v. Callahan*, 168 F.3d 72, 82−83 (2d Cir. 1999).

---

[11] Citations to the docket refer to internal pagination rather than pagination assigned by the ECF system.

The ALJ must "investigate and develop the facts and develop the arguments both for and against the granting of benefits." *Butts*, 388 F.3d at 386 (citation and internal quotation marks omitted). To this end, the ALJ must make "every reasonable effort" to help an applicant get medical reports from her medical sources. 42 U.S.C. § 423(d)(5) (B); 20 C.F.R. §§ 404.1512(d), 416.912(d). If the information obtained from the medical sources is insufficient to make a disability determination, or if the Commissioner is unable to seek clarification from treating sources, then the regulations provide that the Commissioner should ask the claimant to attend one or more consultative evaluations. 20 C.F.R. §§ 404.1512(e), 416.912(e). Additionally, "the ALJ must 'enter these attempts at evidentiary development into the record.'" *Daniels v. Colvin*, 14 CV 02354, 2015 WL 1000112, at *14 (S.D.N.Y. Mar. 5, 2015) (quoting *Jones v. Apfel*, 66 F. Supp. 2d 518, 524 (S.D.N.Y. 1999)).

The ALJ's affirmative obligation to develop the administrative record is "heightened" where, as here, a claimant was unrepresented before the agency. *Moran*, 569 F.3d at 113; *Cruz*, 912 F.2d at 11. "[C]ompliance with the minimum requirements of the regulations is not always sufficient to satisfy the ALJ's heightened duty to develop the record" with respect to *pro se* claimants. *Williams v. Barnhart*, 05 CV 7503, 2007 WL 924207, at *7 (S.D.N.Y. March 27, 2007) (collecting cases). Rather, the ALJ must "adequately protect a *pro se* claimant's rights by ensuring that all of the relevant facts are sufficiently developed and considered" and by "scrupulously and conscientiously prob[ing] into, inquir[ing] of, and explor[ing] for all the relevant facts.'" *Cruz*, 912 F.2d at 11 (citation and internal marks omitted); *see Moran*, 569 F.3d at 113; *Lamay*, 562 F.3d at 509. For *pro se* claimants, "reasonable efforts" to develop the record include "more than merely requesting reports from the treating physicians. It includes issuing and enforcing subpoenas requiring the production of evidence, as authorized by 42 U.S.C. §

405(d), and advising the claimant of the importance of the evidence." *Jones*, 66 F. Supp. 2d at 524.

Significant to this action, "[t]he ALJ's duty to develop the record is further enhanced when the disability in question is a psychiatric impairment." *Jackson v. Colvin*, 13 CV 5655, 2014 WL 4695080, at *16 (S.D.N.Y. Sept. 3, 2014).

### 1. Plaintiff's Mental Impairments

With regard to Bernadel's mental impairments, the ALJ noted that Bernadel alleged disability in part due to depression and anxiety, and testified that she stopped taking classes because it made her anxious. (Tr. 14.) The ALJ also noted the testimony of Bernadel's daughter that her mother was "anxious and depressed", finding this testimony to be "somewhat credible." (*Id.*) However, the ALJ found that these mental impairments were not substantiated by medical evidence, citing to Bernadel's lack of treatment for these alleged impairments, and noting that Bernadel's explanation that she could not afford treatment after her health insurance ceased in 2007 was "not entirely plausible", given that many other claimants in Brooklyn obtain public health insurance. (*Id.*)

In so doing, the ALJ failed to assist Bernadel, who was unrepresented before the agency, in developing the facts. Bernadel stated in her function report that she suffered from anxiety, depression, insomnia, and nightmares. (Tr. 141.) In her appeal of the agency's initial determination, she reiterated that she suffered from anxiety, depression, and insomnia, and that her anxiety made her digestive problems worse. (Tr. 135.) At the hearing, Bernadel additionally testified that she suffered trauma from past domestic violence (Tr. 27), and that her "feeling[s] of helplessness and hopelessness" were so overwhelming that she did not "want to live" (Tr. 30). Bernadel's account finds some support in Dr. Aiken's April 11, 2007 report, in which he noted

that Bernadel was scheduled to begin taking prescription Lexapro for depression. (Tr. 271.) Bernadel testified that the prescription caused her to act strangely, and explained that she did not seek further treatment because of her lack of insurance. (Tr. 23−25, 27−28.)

Dr. Aiken's notations undercut the Commissioner's argument that because there were no records to collect regarding Bernadel's mental conditions – based on Bernadel not having sought treatment for these conditions – the ALJ satisfied her obligation to develop the record. (See Dkt. 17 at 17−18.) As reflected in Dr. Aiken's notations, Bernadel had been prescribed Lexipro for depression by an unidentified doctor. (Tr. 271.) There is no indication that the ALJ attempted to determine the identity of this physician, or sought to obtain the treating records from this physician, Dr. Aiken or Dr. Yang, the orthopedist who had referred Bernadel to Dr. Aiken. (*See* Tr. 171, 185−89, 271.) The ALJ did not even ask Bernadel about the prescribing physician. (*See* Tr. 27−28.)

At a minimum, to the extent that records from Bernadel's treating sources were unavailable, the ALJ should have sought the opinion of a consultative psychological examiner concerning Bernadel's mental impairments and any functional limitations emanating therefrom. 20 C.F.R. § 416.912(e); *Hernandez v. Comm'r of Soc. Sec.*, 13 CV 5625, 2015 WL 5122523, at *18 (S.D.N.Y. Aug. 31, 2015); *see Plummer v. Apfel*, 186 F.3d 422, 433−34 (3d Cir. 1999). The ALJ failed to do so, and indeed, Bernadel was evaluated by only one consultative examiner who conducted a general medical examination. (Tr. 190.) Thus, the ALJ did not fulfill her duty to explore Bernadel's alleged mental impairments.[12]

---

[12] The record reflects that Bernadel was scheduled for a second CE appointment, which was erroneously rescheduled to occur after the ALJ hearing. Contrary to the Commissioner's contention, Bernadel did not seek to cancel the appointment. (Dkt. 17 at 18−19.) Rather, the transcript indicates that Bernadel asked the ALJ whether it was necessary for her to appear for the appointment, since it had been rescheduled to take place after the hearing, and in response,

In short, the Court concludes that the ALJ improperly substituted her judgment for that of competent medical opinion when she found that Bernadel's mental impairments, either singly or in combination with each other or and/or Bernadel's physical impairments, were not sufficiently severe to render her disabled, and remands the case for further development of the record on Plaintiff's mental impairments. On remand, the ALJ should give proper consideration to Bernadel's alleged mental impairments.[13]

## 2. Plaintiff's Physical Impairments

Bernadel contends that the ALJ failed to develop her medical history by not re-contacting Bernadel's treating physician, Dr. Brodman, to obtain his records and his opinion regarding Bernadel's functional limitations. (Dkt. 15−1 at 10−11.) The Commissioner responds that the ALJ properly discharged her duty by making every reasonable effort to seek Dr. Brodman's records. (Dkt. 18 at 4−5.)

As previously noted, the Social Security regulations inform claimants that the agency "will make every reasonable effort to help [claimants] get medical reports from [their] medical sources . . ." 20 C.F.R. § 416.912(d). "Every reasonable effort" is, in turn, defined to mean that the agency "will make an initial request for evidence from [the claimant's] medical source and,

---

the ALJ told Bernadel that the appointment would be canceled. (Tr. 31.) The record also suggests that the scheduled CE was a second visit with Dr. Thukral rather than an appointment with a psychiatrist or psychologist. (*See* Tr. 31, 189, 276.)

[13] Where the record contains evidence of a mental impairment that allegedly prevented the claimant from working, step two of the sequential analysis requires the ALJ to apply a "special technique," outlined in 20 C.F.R. § 404.1520a, to determine the severity of the claimant's impairment. *See Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008); *Hernandez v. Astrue*, 814 F.Supp.2d 168, 180–81 (E.D.N.Y. 2011). This technique assists ALJs in determining "whether claimants have medically determinable mental impairments and whether such impairments are severe." *Oakley v. Colvin*, 3:13 CV 679, 2015 WL 1097388, at *4 (N.D.N.Y. Mar. 11, 2015). The ALJ must "document application of the technique in the decision." 20 C.F.R. §§ 404.1520a(e), 416.920a(e).

at any time between 10 and 20 calendar days after the initial request, if the evidence has not been received, [the SSA] will make one followup request to obtain the medical evidence necessary to make a determination." 20 C.F.R. § 416.912(d)(1). Here, the record indicates that the agency sent a record request to Dr. Brodman on June 9, 2011 and again on June 22, 2011. (Tr. 185−86.) The agency's request sought, in part, Dr. Brodman's assessment of Bernadel's functioning. (Tr. 243−50.) Dr. Brodman failed to respond to these requests. (*See* Tr. 185.) However, the record includes at least some of Dr. Brodman's records, obtained through a record request to Mount Sinai. (*See* Tr. 185, 187.) The agency also arranged for Bernadel to attend one consultative medical examination with Dr. Thukral regarding her physical impairments, pursuant to 20 C.F.R. § 416.912(e). (*See* Tr. 188, 190.)

While these steps comport with the SSA regulations' minimum requirements, the ALJ needed to do more to fulfill her obligation to develop the record under the "heightened" standard that applies to *pro se* claimants. *See Moran*, 569 F.3d at 113; *Williams*, 2007 WL 924207, at *7. "Reasonable efforts" to develop the record for *pro se* claimants "entails more than merely requesting reports from the treating physicians. It includes issuing and enforcing subpoenas requiring the production of evidence, . . . and advising the plaintiff of the importance of the evidence." *Jones*, 66 F. Supp. 2d at 524.[14] The ALJ failed to satisfy her duty to develop the record by not taking such additional steps to obtain Dr. Brodman's records and his opinion regarding Bernadel's functional limitations. *See Rosasio v. Astrue*, 12 CV 3594, 2013 WL 3324299, *7 n.4 (S.D.N.Y. June 25, 2013) (reasonable efforts made after (1) plaintiff's counsel attempted to obtain records herself, (2) the ALJ issued a subpoena, and (3) the ALJ made two follow-up calls).

---

[14] Notably, here, the ALJ's record requests incorrectly spelled Dr. Brodman's name as "Michael Broadman." (Tr. 185, 243−249; *see* Dkt. 18 at 4 n.1.)

The Commissioner asserts that Dr. Brodman's records were irrelevant to the ALJ's determination, because Dr. Brodman's treatment was for gynecological issues, rather than the claimed disabling impairments. (Dkt. 18 at 5.) The Commissioner is incorrect for several reasons. First, it is far from clear that the ALJ made a determination that the treating source evidence was "irrelevant", as the ALJ did not state anywhere in her opinion that she had made such a determination. Rather, the ALJ accorded "great weight" to the opinion of the consulting examiner Dr. Thukral in the absence of opinions from treating sources. (Tr. 14.) Furthermore, given that the ALJ expressly relied on the lack of the treatment records as a reason for rejecting Bernadel's claim for disability, an implicit finding by the ALJ that the records were irrelevant would have been inappropriate. *See Rivera v. Colvin*, 11 CV 7469, 2014 WL 3732317, at *31−32 (S.D.N.Y. July 28, 2014) (rejecting an argument that treatment records were unnecessary where the ALJ relied on the lack of treatment records as a reason for rejecting treating opinions); *see also Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987) (ordering remand where it was unclear whether the ALJ applied the proper legal standards).

Moreover, the Court cannot agree that Bernadel's abdominal myomectomy, prior pelvic pain, and other uterine issues, all treated by Dr. Brodman, were completely unrelated to her alleged abdominal discomfort and back pain. Contrary to the Commissioner's argument, Bernadel also claimed a disability based on her history of a right ovary removal, ovarian cyst, and myomectomy in 2001. (Tr. 156.) In a June 2011 pain questionnaire, Bernadel reported that her abdominal pain and discomfort began in 1999 when she had her fibroid surgery. (Tr. 148.)

Although Bernadel's motion focuses on Dr. Brodman's records, on remand the ALJ should develop the record with regard to other treating sources. In particular, the ALJ should request additional records from Dr. Tenembaum, who performed Bernadel's surgery relating to

her bowel obstruction, adhesions, and hernia. (Tr. 214−17.) Bernadel reported that she continued to visit Dr. Tenembaum for follow-up until 2007. (Tr. 161.) The ALJ should also make additional efforts to obtain the records and opinion of Dr. Douglas Dietrick, whom Bernadel saw for her diverticulitis, a colonoscopy, and regular evaluations between 2005 and 2007. (Tr. 160.)

Dr. Aiken's April 11, 2007 report also indicates that, based on the results of a neurological examination, he suspected that Bernadel might have been suffering from a symptomatic herniated disc, prompting Dr. Aiken to initiate steroid therapy and pain medications (Tr. 272). The report, however, does not address how these impairments affected Bernadel's functional abilities. (*Id.*) Given the ALJ's obligation to ensure the full development of the record, she should have sought to obtain Dr. Aiken's assessment of Bernadel's functioning. *See Barnave v. Barnhart*, 04 CV 2910, 2005 WL 1129780, at *6 (E.D.N.Y. May 13, 2005) (discussing the importance of obtaining not merely medical records from a treating physician, but also a report that sets forth the opinion of that treating physician).

Additionally, as previously described, the medical records obtained by the ALJ and submitted by Bernadel also revealed that Dr. Yang referred Bernadel for a bone density study in 2006 and a neurological consultation with Dr. Aiken in 2007. (Tr. 171, 173, 175, 272.) Since these records suggest that Bernadel had a treating relationship with Dr. Yang shortly before her alleged onset date, the ALJ should fully explore the facts regarding Dr. Yang's treatment of Bernadel, and obtain Dr. Yang's assessment of Bernadel's functioning.

## B. Credibility

In assessing whether a claimant is disabled, the ALJ may consider the claimant's allegations of pain and functional limitations; however, the ALJ retains the discretion to assess

the claimant's credibility.  *See Fernandez v. Astrue*, 11 CV 3896, 2013 WL 1291284, at *18 (E.D.N.Y. Mar. 13, 2013) (citing *Taylor v. Barnhart*, 83 F. App'x 347, 350 (2d Cir. 2010) and *Correale-Englehart v. Astrue*, 687 F. Supp. 2d 396, 434 (S.D.N.Y. 2010)).  The SSA regulations provide a two-step process for evaluating a claimant's assertions of pain and other limitations. First, the ALJ must decide whether the claimant suffers from "a medically determinable impairment that could reasonably be expected to produce the symptoms alleged."  20 C.F.R. § 404.1529(b).  Second, where the record shows that the claimant has such a medically determinable impairment, the ALJ evaluates "the intensity and persistence of [the claimant's] symptoms [to] determine" the extent to which they limit the claimant's ability to work.  20 C.F.R. § 404.1529(c); *see also Fernandez*, 2013 WL 1291284, at *18.

Where the ALJ finds that the claimant's testimony is inconsistent with the objective medical evidence in the record, the ALJ must evaluate the claimant's testimony in light of seven factors: 1) the claimant's daily activities; 2) the location, duration, frequency, and intensity of the pain; 3) precipitating and aggravating factors; 4) the type, dosage, effectiveness, and side effects of any medications taken to alleviate the pain; 5) any treatment, other than medication, that the claimant has received; 6) any other measures that the claimant employs to relieve the pain; and 7) other factors concerning the claimant's functional limitations and restrictions as a result of the pain.  20 C.F.R. § 404.1529(c)(3)(i)-(vii).

Here, the ALJ completed only the first step, concluding that Bernadel did not suffer a medically determinable impairment that could reasonably be expected to produce her alleged symptoms alleged. (Tr. 13−14).  As previously discussed, that conclusion was erroneous because it rested on an incomplete medical record that the ALJ failed to sufficiently develop. Additionally, the Court agrees with Bernadel that ALJ committed legal error in making her

assessment that Bernadel's testimony regarding her symptoms and functional limitations was not credible.  (*See* Dkt 15−1 at 7, 11−12.)

In particular, the ALJ erred in drawing a negative inference from Bernadel's lack of treatment, which appears to be directly attributable to her indigence.  Bernadel explained that she could not afford medical appointments after her insurance stopped in June 2007, except for some appointments with Dr. Brodman, who saw her without charge.  (Tr. 23−25, 28.)  She further explained that while she had public health insurance for a short time, she was unable to find doctors who would accept the insurance.  (Tr. 24−25.)  Courts in this Circuit have observed that a claimant's credibility regarding her impairments should not be discounted for failure to obtain treatment she could not afford.  *Shaw v. Chater*, 221 F.3d 126, 133 (2d Cir. 2000) ("[i]t would fly in the face of the plain purposes of the Social Security Act to deny claimant benefits because he is too poor to obtain additional treatment"); *see Long v. Colvin*, 12 CV 610, 2013 WL 3013667, at *4 (E.D.N.Y. June 18, 2013) (noting that the ALJ should not have discounted the severity of the claimant's condition without inquiring into reasons for the lack of treatment, including the termination of claimant's health insurance, which "could explain the less frequent treatment"); *McGregor v. Astrue*, 993 F. Supp. 2d 130, 142−43 (N.D.N.Y. 2012) (noting that ALJ erred by failing to consider claimant's testimony that he did "not have health insurance, which certainly provide[d] an explanation for failing to seek treatment").[15]  Nor should Bernadel be penalized for her inability to obtain public health insurance.  (*See* Tr. 14.)

---

[15] The Commissioner acknowledges this case law, but claims that the ALJ cited to the lack of treatment to show that there was a lack of medical evidence documenting Plaintiff's impairment, rather than using it in assessing her credibility.  (Dkt. 17 at 16.)  The Court disagrees.  Bernadel and her daughter both testified that Bernadel suffered from anxiety and depression.  (Tr. 27, 30, 33.)  By finding that the lack of treatment failed to substantiate Bernadel's claim of mental impairments, the ALJ was also rejecting, as non-credible, both Bernadel and her daughter's testimony about these impairments.  (*See* Tr. 14.)  Thus, the ALJ relied on the lack of treatment

Moreover, courts have found that faulting a claimant with mental impairments, such as anxiety and depression, for failing to pursue mental health treatment is a "questionable practice." *McGregor*, 993 F. Supp. 2d at 143; *Day v. Astrue*, 07 CV 157, 2008 WL 63285, at *5 n.6 (E.D.N.Y. Jan. 3, 2008) (noting that it "is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation") (citations omitted).

### III.  Remedy

Accordingly, the Court remands this action to allow the ALJ to fully develop the record regarding Bernadel's mental and physical impairments.  In considering the evidence, the ALJ is required to meaningfully consider the combined effect of Bernadel's impairments.  *See* 20 C.F.R. § 404.1520(a)(4)(ii), (c) (requiring a determination of whether the claimant suffers from a medical impairment, or combination of impairments, that is "severe").  After developing the record and according the appropriate weight to the various medical sources on the record, the ALJ should additionally reassess Bernadel's credibility with reference to the factors listed in 20 C.F.R. § 404.1529(c)(3)(i)–(vii).  To the extent the ALJ discredits Bernadel's statements concerning her pain or the intensity, persistence and limiting effects of her impairments, the ALJ should indicate how she assessed and balanced the various factors.

### CONCLUSION

For the reasons set forth above, the Court DENIES the Commissioner's motion for judgment on the pleadings and GRANTS Plaintiff's cross-motion.  The Commissioner's decision is remanded for further consideration and new findings consistent with this Memorandum &

---

both to find Bernadel not credible and to find her mental impairments unproven.  That the ALJ did not find Bernadel credible is buttressed by the ALJ's explicit finding that Bernadel's explanation that she could not afford treatment was "not entirely plausible" (*id.*), notwithstanding the impropriety of reaching such a conclusion, *see Shaw*, 221 F.3d at 133.

Order.  The Clerk of Court is respectfully requested to enter judgment accordingly and terminate this action.

SO ORDERED:


 /s/ Pamela K. Chen
PAMELA K. CHEN
United States District Judge

Dated: September 29, 2015
       Brooklyn, New York